UNITED STATES POSTAL
SERVICE, Plaintiff,

v.

HASELRIG CONSTRUCTION
CO., et al., Defendants.

No. CIV.A. AW–02–170.

United States District Court,
D. Maryland.
Southern Division.

Dec. 28, 2004.

Larry D. Adams, Office of the United States Attorney, Thomas M. Dibiagio, Baltimore, MD, for Plaintiff.

Burrell L. Haselrig Construction Co., pro se.

Timothy Patrick Leahy, Toby N. Byrd, Byrd and Byrd LLC, Bowie, MD, Philip Tucker Evans, Marc E. Miller, Holland and Knight LLP, Linda M. Correia, Webster Fredrickson and Brackshaw, Washington, DC, Stephen P. Kauffman, Stephen P. Kauffman PA, Baltimore, MD, for Defendants.

Edward Malcolm Kimmel, Takoma Park, MD, for Defendant and Claimants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

This action involves a dispute between Byrd & Byrd, LLC ("Byrd & Byrd" or "the law firm") and Haselrig Construction Company, Inc. ("Haselrig") concerning Byrd & Byrd's right to legal fees for its representation of Haselrig in litigation, which eventually resulted in settlement, against the United States Postal Service ("USPS"). For the reasons discussed herein, the Court finds that the USPS Contingency Fee Agreement between Byrd & Byrd and Haselrig is void and that Byrd & Byrd will be awarded its reasonable hourly attorneys fees.

## I. FACTUAL & PROCEDURAL BACKGROUND

In a Memorandum Opinion and Order dated August 28, 2003, this Court granted Byrd & Byrd's Motion for Summary Judgment in this case, and awarded the law firm attorneys fees of 40% of the gross amount recovered from USPS, or approximately $1,118,692.14. On March 22, 2004, this Court issued a Memorandum Opinion and Order vacating in part its prior judgment. Specifically, this Court vacated the portion of its Opinion that addressed the appropriate amount of attorneys fees to be awarded Byrd & Byrd because, upon further reflection, this Court believed that there were material issues in genuine dis-

pute. A bench trial was held from October 4, 2004 to October 8, 2004. The following constitute the Court's findings of fact and conclusions of law.

## II. *FINDINGS OF FACT*

### 1. *The January 14, 1998 USPS Contingency Fee Agreement*

In 1996, Haselrig was awarded a contract to construct a USPS postal facility located in La Plata, Maryland ("the Contract"). In November 1996, Haselrig partnered with Mr. Rufus Stancil ("Mr.Stancil") and Mrs. Delores Stancil ("Mrs.Stancil") (collectively, "the Stancils") to form a joint venture to construct a USPS postal facility pursuant to the Contract. On February 3, 1997, USPS terminated the Contract, citing the failure of Haselrig to make sufficient progress on the construction of the facility. On April 15, 1997, USPS reinstated the Contract. On September 20, 1997, Haselrig's Contract was again terminated by USPS for failure to make sufficient progress. At the time of this second termination, Burrell Haselrig ("Mr.Haselrig"), Haselrig's sole stockholder and president, and Mr. Stancil were referred to Toby N. Byrd ("Mr.Byrd"), of Byrd & Byrd, for legal assistance.

On September 29, 1997, Haselrig retained Byrd & Byrd as counsel in its dispute with USPS over the termination of the Contract ("the USPS matter"). Haselrig entered into an hourly fee agreement with Byrd & Byrd ("USPS Hourly Fee Agreement"), which was personally guaranteed by Messrs. Haselrig and Stancil. Mr. Byrd initially requested a $10,000 retainer fee, but when this request was met with substantial resistance, Mr. Byrd agreed to accept a reduced retainer of $1,000. At the time Mr. Byrd was retained, Haselrig, Mr. Haselrig, and Mr. Stancil were all in deep financial trouble;

Haselrig owed hundreds of thousands of dollars to the Industrial Bank of Washington ("the Bank"), a debt which Messrs. Haselrig and Stancil had been personally guaranteed.

Mr. Byrd commenced performing legal work for Haselrig, and by December 31, 1997, Haselrig had accumulated an outstanding legal bill in the amount of $16,278.14. Haselrig was unable to pay this bill, and the suggestion arose that Haselrig replace the hourly fee agreement between Haselrig and Byrd & Byrd with a contingency fee agreement. In the days leading up to January 14, 1998, Mr. Byrd met with Mr. Haselrig and the Stancils concerning the new contingency fee arrangement. On January 14, 1998, Haselrig entered into a contingency fee agreement with Byrd & Byrd in the USPS matter ("USPS Contingency Fee Agreement"). That same day, Haselrig and Byrd & Byrd entered into a separate hourly fee agreement for litigation concerning Haselrig's claim against Bernard Johnson Young ("BJY"), the architectural firm handling the USPS project ("BJY Hourly Fee Agreement").

The USPS Contingency Fee Agreement contains a Paragraph 4, which is at the center of the dispute in this case. Paragraph 4 provides, in pertinent part:

I agree that my attorney is entitled to reasonable compensation in the event that my claim(s) are withdrawn from his office. I agree that under no circumstances shall such fee be less than the greater of: (a) the number of hours spent on the case by the law firm times $175.00 per hour; or (b) the appropriate percentage of any settlement offer or judgment, pursuant to 1a, above; [or] (c) Thirty Five Thousand ($35,000.000) Dollars.

Section 1a of the USPS Contingency Fee Agreement provides for a contingency fee of 40% of the recovery. The Court notes that there is no evidence or suggestion that Haselrig ever withdrew its claims from the offices of Byrd & Byrd.

In March 1997, Haselrig filed a complaint with the Postal Service Board of Contract Appeals ("the Board"), claiming wrongful termination of the Contract by USPS. The litigation was bifurcated into a liability phase and a quantum phase. On December 2, 1999, the Board issued a decision as to liability, finding that USPS had improperly terminated the Contract, and remanded the case to the parties for a determination of damages. USPS appealed the decision of the Board, and on December 29, 1999, Haselrig retained Thomas Cartwright, Esquire ("Cartwright") as counsel in the USPS appeal.

On October 31, 2000, USPS Contracting Officer Teresa Riley ("Officer Riley") determined that Haselrig was entitled to $73,877.60 in damages, payment of which would be made directly to the Bank. On November 6, 2000, Mr. Byrd sent a letter to USPS opposing direct payment to the Bank. In this letter, Mr. Byrd stated that payment to the Bank "will be in direct contradiction to the Annotated Code of Maryland, Business Occupations and Professions Article, Section10–501 [the attorney's lien provision], and any payment in violation of the code will be vigorously pursued." When Cartwright learned of the November 6, 2000 letter, he requested that Mr. Byrd copy Cartwright on all future communications between Mr. Byrd and Haselrig. Mr. Byrd failed to honor this request. On November 29, 2000, USPS paid the settlement amount into this Court's registry, which commenced what we have referred to as the First Interpleader Action.

## 2. *The First Interpleader Action*

On November 27, 2000, Haselrig sent a letter to Mr. Byrd, instructing him to "do nothing" with regard to the USPS disbursement. On December 19, 2000, Mr. Byrd sent a letter to Robert Audi ("Audi"), Haselrig's Vice President, in which Mr. Byrd stated: "As I understand your direction, I am to do nothing with regard to the USPS disbursement." In January 2000, Mr. Byrd began preparing an answer to the First Interpleader Action on behalf of his law firm, seeking satisfaction of Byrd & Byrd's legal fees. However, although Mr. Byrd was essentially representing himself and his law firm in the First Interpleader Action, and Haselrig had instructed him not to perform any additional work on its behalf, Mr. Byrd billed Haselrig for the legal services he performed in conjunction with the First Interpleader Action.

In the First Interpleader Action, Mr. Byrd sought to recover the entire $73,877.60 in satisfaction of his attorneys fees. On January 24, 2001, Mr. Byrd filed a Motion for Summary Judgment in support of Byrd & Byrd's claim. In this motion, Mr. Byrd represented that the September 29, 1997 USPS Hourly Fee Agreement was the parties' operative fee agreement. On February 9, 2001, the Bank filed an opposition to Mr. Byrd's Motion for Summary Judgment. Relying upon the January 14, 1998 USPS Contingency Fee Agreement, the Bank alleged that Mr. Byrd's operative fee agreement in the USPS matter was a 40% contingency fee arrangement. On February 27, 2001, Mr. Byrd filed a reply to the Bank's opposition, admitting to the existence of the USPS Contingency Fee Agreement, but representing that the agreement was a "modified hourly fee arrangement." In his reply brief, Mr. Byrd explained the opera-

tion of this modified hourly fee arrangement as follows:

> Byrd & Byrd's original fee arrangement with hourly. However, due to the financial difficulties endured by Haselrig stemming from the wrongful termination by the USPS, Haselrig became unable to pay its legal bills. Haselrig therefore entered into an agreement with Byrd & Byrd whereby Haselrig would be obligated to Byrd & Byrd on an hourly basis but that payment was to be made after final resolution of the claim. In exchange for this forbearance, Byrd & Byrd would be entitled to the greater of the hourly fee due or 40% of the award.

(internal citations omitted).

In contrast to his representations to the Court in the First Interpleader Action, on July 20, 2000, Mr. Byrd sent a letter to Audi concerning the progress of the USPS litigation, which states in pertinent part:

> Based on the acknowledgment of the *contingent fee agreement on the USPS claim,* I will try to expedite the Postal Service Review so that the process can be moved along.

(emphasis added). Nowhere in this letter did Mr. Byrd indicate that the January 14, 1998 USPS Contingency Fee Agreement entitled him to payment on an hourly basis or payment pursuant to a modified hourly fee arrangement. At his October 9, 2002 deposition, and again at trial, Mr. Byrd testified that Paragraph 4 of the January 14, 1998 fee agreement never became operable, as Paragraph 4 was only applicable if Haselrig chose to withdraw its claim from Byrd & Byrd, a condition that never occurred.

No claim was filed in the First Interpleader Action on behalf of Haselrig. On March 8, 2001, Audi sent a fax to Mr. Byrd, asking, "why didn't you file an action for the Interpleader funds on behalf of [Haselrig]...?" Although the record is unclear on this point, apparently Haselrig believed that, as Mr. Byrd was billing Haselrig for services performed in conjunction with the First Interpleader Action, he was advocating on Haselrig's behalf in that action. On March 13, 2001, Mr. Byrd sent a letter to Audi, which offered up a convoluted response to Mr. Audi's question. The Court notes that the March 13, 2001 letter was perhaps designed to cause confusion and prevent Haselrig from either asserting its claims or recognizing the full extent of Mr. Byrd's behavior. During late March and early April 2001, Mr. Byrd and Audi exchanged a series of letters and faxes, which make clear that, for whatever reason, Haselrig was not fully aware of Mr. Byrd's conduct in the First Interpleader Action.

On April 18, 2001, the Bank sent Mr. Byrd an offer to settle the First Interpleader Action with Haselrig. In exchange for $70,000 of the First Interpleader Action funds, the Bank offered to cap the amount owed to the Bank by Haselrig at $380,000, stop running interest and attorneys fees, and wait until the case was ultimately settled to collect its debt. Mr. Byrd did not note his potential conflict of interest in advising Haselrig as to this offer, but rather, on April 20, 2001, forwarded the proposal to Audi under a cover letter which stated, "I think they are nuts."

On July 21, 2001, this Court awarded the full settlement amount of $74,323.94 to Byrd & Byrd. On September 19, 2001, the Bank made a second offer to settle with Haselrig. Pursuant to this offer, in exchange for approximately $25,000 of the First Interpleader Action funds, the Bank would cap the amount due at $250,000, stop running interest and attorneys fees, and wait until the case was ultimately settled to collect its debt. On September 26, 2001, Mr. Byrd sent a letter to the Bank's

attorney requesting an accounting in order to fully evaluate the Bank's settlement offer. That same day, without having received the accounting from the Bank, Mr. Byrd sent the Bank's proposal to Mr. Haselrig, to which he attached a letter advising, "I cannot recommend acceptance."

### 3. *Second Interpleader Action*

In December 2001, the parties settled the USPS dispute for an additional $2,580,000. USPS paid the settlement monies into the Court's registry and commenced this present action ("Second Interpleader Action"). On February 4, 2002, Mr. Byrd filed a Motion for Summary Judgment, claiming that Byrd & Byrd was entitled to 40% of the settlement recovery, plus expenses, law clerk/paralegal fees, dues & owing hourly fees, and hourly fees for subsequent other legal services. This claim was again based on the USPS Contingency Fee Agreement of January 14, 1998.

### 4. *The BJY Matter*

As previously noted, on January 14, 1998, Haselrig entered into two agreements with Byrd & Byrd; a contingency fee agreement in the USPS matter and an hourly fee agreement in the BJY matter. Just as Haselrig had been unable to pay its hourly bills in the USPS matter, Haselrig was unable to pay the hourly fees associated with the BJY Hourly Fee Agreement. As such, on September 28, 2000, Haselrig and Byrd & Byrd entered into a contingency fee agreement for services concerning the BJY matter ("BJY Contingency Fee Agreement"). The terms of the BJY Contingency Fee Agreement and the USPS Contingency Fee Agreement are very similar, and in particular, the Paragraph 4 provisions contained in each agreement are virtually identical.

On May 16, 2001, the BJY matter was settled for $200,000. The settlement monies were paid into the Prince George's County Circuit Court. On June 15, 2001, Mr. Byrd filed a petition for attorneys fees on behalf of Byrd & Byrd, claiming that the BJY Contingency Fee Agreement was a modified fee agreement, under which he was entitled to the greater of the hourly or contingency fee. In the BJY matter, Mr. Byrd claimed he was owed an hourly fee of $89,633.07, rather than the slightly lower contingency fee of $84,396.26. As a part of this petition, Mr. Byrd represented that Paragraph 4 of the BJY Contingency Fee Agreement provided that:

> ... under no circumstances shall such fee be less than the greater of: (a) the number of hours spent on the case by the law firm times $175.00 per hour or (b) the appropriate percentage [40%] of any settlement offer or judgment...

In making this representation, Mr. Byrd omitted the first sentence of Paragraph 4 from his petition, which explains that the provision is only applicable "in the event [Haselrig's] claims are withdrawn from [Mr. Byrd's] office." The Court finds that this omission was misleading and materially altered the meaning of Paragraph 4. Furthermore, given the attention that was paid to Paragraph 4 both during the First Interpleader Action and the Second Interpleader Action, this Court finds that this omission cannot be construed as an simple oversight.

At trial, Haselrig questioned Mr. Byrd concerning the applicability of Paragraph 4 of the BJY Contingency Fee Agreement, given that Haselrig never withdrew its claims from Mr. Byrd's office. Mr. Byrd explained that he believed that Haselrig settled the BJY matter for substantially less than its true value, and that Haselrig's acceptance of this inferior settlement was

essentially the equivalent of Haselrig withdrawing its claim from the firm.

## III. CONCLUSIONS OF LAW

### 1. The USPS Contingency Fee Agreement was Unreasonable in Principle, and is thus Void

 Under Maryland law, in order for a fee agreement to be valid, it must be both reasonable in principle and reasonable in operation. *Brown & Sturm v. Frederick Road Ltd. P'ship*, 137 Md.App. 150, 768 A.2d 62, 79 (2001). Where an attorney attempts to modify an existing fee agreement during the course of a confidential attorney-client relationship, the law makes a presumption against the attorney and in favor of the client, and the onus is on the attorney to prove the fairness of the transaction. *Attorney Grievance Comm'n of Maryland v. Korotki*, 318 Md. 646, 569 A.2d 1224, 1234 (1988). Indeed, it is a well-settled proposition of law that, "[p]rior to retention, an attorney may bargain at arm's length with a prospective client, but after that attorney has been hired, the parties stand in a confidential and fiduciary relationship, and the attorney bears the burden of showing that any subsequent transaction with his client is voluntary and fair." *Brown*, 768 A.2d at 73; *see Korotki*, 569 A.2d at 1234.

 The Maryland Court of Appeals has explained an attorney's duty to his existing client as follows:

[T]o sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as

beneficial to the client as it would have been had the client dealt with a stranger. And the fact that the client agreed to the [fee agreement] does not relieve the attorney from the burden of showing that the amount agreed upon was fair and reasonable.

*Korotki*, 569 A.2d at 1234 (internal citations omitted). To that end, "[f]or a contract between attorney and client to be voluntary, (i) the attorney must not use his dominant position in the relationship to take unfair advantage of the client, and (ii) the attorney must provide full disclosure of all information and advice required of the attorney under the existing confidential relationship." *Brown*, 768 A.2d at 74; *see* Maryland Rules of Professional Conduct, Rule 1.5(c) (an attorney should clearly explain to his client the implication of any contingency fee arrangement).

 At the time the parties entered into the USPS Contingency Fee Agreement, Byrd & Byrd stood in a confidential and fiduciary relationship with Haselrig. Because Byrd & Byrd occupied a position of trust, Byrd & Byrd has the burden of proving that the agreement was fair and voluntary. However, the Court finds that the USPS Contingency Fee Agreement was not fair and voluntary, as Byrd & Byrd used its dominant position to take unfair advantage of Haselrig, inducing Haselrig to enter into an unreasonable free agreement that operated to Haselrig's consistent detriment. Moreover, Byrd & Byrd did not fully disclose all of the relevant information and advice required under the existing attorney client relationship.

Professor Abraham A. Dash ("Professor Dash")[1] testified on behalf of Haselrig as

---

1. The Court notes that Professor Dash is an expert in legal ethics, and is particularly qualified to testify as to the reasonableness of attorneys fees, as he served as an expert on

to the reasonableness of the USPS Contingency Fee Agreement. Professor Dash explained that a mixed contingency-hourly fee arrangement could in theory be fair and equitable if the client was allowed to pay the lesser of the two amounts. However, Professor Dash found that the fee agreement in this case, which required Haselrig to pay the greater of the contingency or hourly fee, was unreasonable from its inception. Professor Dash explained the inherent difficulties in such an arrangement as follows:

> The fee agreement in this case, however, defeats the purpose of a contingency fee. Indeed, it gives merit to some contemporary criticism of contingency fee contracts ... with the way in which lawyers are able through contingent fees to overreach clients who tend to be under funded for litigation and ill equipped to understand the complexities of risk in litigation.

(internal citations omitted).

Furthermore, Professor Dash explained that, under the USPS Contingency Fee Agreement as interpreted by Byrd & Byrd, because the law firm reserved for itself the choice of whether to charge an hourly or contingency rate, "[d]epending on the gross settlement, the hourly rate *could* end up consuming over 50% of the proceeds, which would be prohibited in a straight contingency fee agreement." The Court agrees with Professor Dash, and notes that the USPS Contingency Fee Agreement is unreasonable not only by its terms but particularly as this agreement—which is largely skewed in favor of Byrd & Byrd—was entered into during the course of an attorney-client relationship.

Mr. James Greenan ("Greenan"), Byrd & Byrd's expert, also spoke with a great deal of authority concerning the ethical issues involved in attorney fee agreements. However, the Court notes that it became clear during the course of the trial that Greenan had been provided with a less than complete picture of the law firm's various interpretations of the fee agreements between itself and Haselrig. Even given this somewhat limited perspective, when confronted with Paragraph 4 of the USPS Contingency Fee Agreement, Greenan agreed with Professor Dash that Paragraph 4 never entered into force, as Haselrig's claims were never withdrawn from the offices of Byrd & Byrd. This lends further support to the Court's conclusion, discussed in greater detail below, that the USPS Contingency Fee Agreement was unreasonably ambiguous in both construction and interpretation.

The ambiguity of the USPS Contingency Fee Agreement is evidenced by Byrd & Byrd's subsequent and varied interpretations of the agreement. By this Court's count, Byrd & Byrd has construed the USPS Contingency Fee Agreement in at least three different ways, claiming, at times convenient, that the agreement between Haselrig and Byrd & Byrd was a contingency fee agreement, an hourly fee agreement, and a modified hourly fee agreement:

(1) In July 2000, Mr. Byrd told Audi that the USPS Contingency Fee Agreement was a contingent fee arrangement;

(2) On January 24, 2001, in his Motion for Summary Judgment in the First Interpleader Action, Mr. Byrd represented that he was operating under an hourly fee agreement;[2]

---

this subject in both the *Merry–Go–Round* case and *Angelos* tobacco litigation.

**2.** Mr. Byrd represented that the parties' operative agreement was the USPS Hourly Fee

(3) On February 27, 2001, in his reply brief in support of his Motion for Summary Judgment in the First Interpleader Action, Mr. Byrd represented that the USPS Contingency Fee Agreement was a "modified hourly fee arrangement," whereby Byrd & Byrd would receive the greater of the hourly fee or 40% of the award;

(4) On February 4, 2002, in his Motion for Summary Judgment in the Second Interpleader Action, Mr. Byrd represented that the USPS Contingency Fee Agreement was a "modified hourly fee arrangement";

(5) In May 2001, in the BJY matter, Mr. Byrd again represented that the USPS Contingency Fee Agreement was a "modified hourly fee arrangement." Mr. Byrd explicitly argued that Paragraph 4 applied to the agreement as a whole, and in citing · to Paragraph 4, he edited out the first sentence of the provision, which provides that Paragraph 4 is only applicable in the event that Haselrig's claims are withdrawn from Mr. Byrd's office.

(6) At his October 9, 2002 deposition and at trial, Mr. Byrd testified that Paragraph 4 of the USPS Contingency Fee Agreement never became operable in the USPS matter.

Byrd & Byrd's varied interpretations of the USPS Contingency Fee Agreement suggest that, at best, Byrd & Byrd lacked a clear understanding of the terms and operation of the agreement or, at worst, that Byrd & Byrd construed the agreement in whatever way was most immediately advantageous in order to serve its own financial interests, at the expense of the interests of its client. Regardless, the

necessary conclusion is that, because Byrd & Byrd did not provide Haselrig with a consistent understanding of what proved to be an ambiguous document, the law firm did not fully disclosure of all information and advice required under the confidential relationship, and thus the USPS Contingency Fee Agreement was not voluntary.

Byrd & Byrd now argues that the USPS Contingency Fee Agreement is a 40% contingency fee arrangement, and insists that Paragraph 4 "never became operable." However, the law firm provides no coherent explanation as to why, if Paragraph 4 never came into force, Mr. Byrd represented to the Court in both the First Interpleader Action and the Second Interpleader Action that the USPS Contingency Fee Agreement was a modified agreement, under which Mr. Byrd would be paid the greater of the hourly or contingency fees.

In evaluating Byrd & Byrd's credibility on this point, the Court notes that Byrd & Byrd has offered this Court several conflicting explanations as to the parties' operative fee agreement. As such, the Court cannot conceive that Byrd & Byrd clearly explained the USPS Contingency Fee Agreement to Haselrig. For all these reasons, the Court finds that Mr. Byrd induced his clients to sign a fee agreement that operated to the consistent disadvantage of Haselrig, that he did not advise his clients as to the true nature of the agreement, and that he did not fully disclose all of the information and advice required under the existing attorney client relationship.

██ Additionally, the Court finds that the USPS Contingency Fee Agreement was unreasonable at its inception, in that Paragraph 4 of the agreement attempts to unlawfully penalize a client for firing his attorney. Under Paragraph 4, if Haselrig

Agreement entered into on September 28, 1997.

chose to withdraw its claim from Byrd & Byrd, the law firm would be entitled to the greater of its hourly rate, 40% of any settlement offer or judgment, or $35,000. However, the Court of Appeals of Maryland has made clear that a client has the right to freely discharge his attorney and that, when such a termination occurs, the attorney is entitled only to the reasonable value of his services. *Skeens v. Miller,* 331 Md. 331, 628 A.2d 185, 190 (1993). The Court explained its reasoning as follows:

> The better rule to be followed, because of the peculiarity of attorney-client relationships, is that the client should have a right to discharge without cause an attorney employed under a contingent fee agreement and, upon such discharge, the attorney would be limited to a *quantum meruit* recovery for his services performed to the date of discharge, rather than recovery on the basis of the percentage provided in the agreement, and that no such recovery based on *quantum meruit* may be had until such time as the contingency provided for in the original agreement has occurred.

*Id.* at 189 (internal citations omitted). Therefore, Paragraph 4, which attempts to seek recovery of a contingency fee in the event of termination, unlawfully limits a client's right to fire his attorney. *See First Union Nat'l Bank of Maryland v. Meyer, Faller, Weisman & Rosenberg,* 125 Md.App. 1, 723 A.2d 899, 909 (1999).

In representing Haselrig, Byrd & Byrd achieved what all agree is a highly successful result. However, the Court finds the law firm's representation in other ways lacking. Specifically, during the First Interpleader Action, Byrd & Byrd continued to represent Haselrig, although it had an arguable conflict of interest. Byrd & Byrd failed to explain this conflict to Haselrig. Byrd & Byrd also failed to fully investigate

offers of settlement made to Haselrig, and advised Haselrig to reject offers based on less than complete information. Moreover, Mr. Byrd attempted to obscure his actions and motivations during the First Interpleader Action from his client. For all of these reasons, the Court finds that the USPS Contingency Fee Agreement between Byrd & Byrd and Haselrig was unreasonable at its inception and is thus void.

### 2. *Calculation of Fees*

■ In the absence of a valid agreement for attorneys fees, Maryland courts look to the lodestar method and Rule 1.5 of the Maryland Rules of Professional Conduct to determine reasonable attorneys fees. *Garcia v. Foulger Pratt Dev., Inc.,* 155 Md. App. 634, 845 A.2d 16, 39–40 (2003) (*citing Friolo v. Frankel,* 373 Md. 501, 819 A.2d 354, 365 (2003)). The lodestar method is a commonly used approach, which involves multiplying the number of hours expended by an attorney's normal hourly rate to create a "lodestar" figure. *Goldenberg v. Marriott PLP Corp.,* 33 F.Supp.2d 434, 437 (D.Md.1998). That figure may then be adjusted to account for other factors in the case, including those factors set forth by Rule 1.5 of the Maryland Rules of Professional Conduct. *See id.*

> Rule 1.5 provides as follows:
>
> (a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
>
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer,

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

■ In this case, the Court is required to weigh the admittedly impressive result obtained by Byrd & Byrd in the USPS litigation against what the Court finds to be a fundamental breach of the law firm's ethical duties to its client. Several of the Rule 1.5 factors are relevant to this evaluation. Although the legal issues involved in the USPS matter were not novel, they were complex, and as such, the case required the services of a skilled attorney with experience in construction law. Additionally, the amount of money involved and the results obtained in the case weigh in favor of Byrd & Byrd; the law firm ultimately secured a gross recovery of $2,796,730.35 for Haselrig. On the other hand, considering the nature of the professional relationship between Byrd & Byrd and Haselrig, as discussed previously, the law firm failed to fulfill its ethical obligations to its client.[3] The Court finds that, given the competing considerations under the Rule 1.5 analysis, a Rule 1.5 adjustment is not warranted. While the law firm's failure to deal candidly with its client weighed heavily in our determination to void the USPS Contingency Fee Agreement, considering the ultimate favorable outcome of the USPS litigation, the Court believes Byrd & Byrd's reasonable hourly fees to be a fair award in this case.

However, the submissions made to this Court concerning Byrd & Byrd's reasonable hourly fees are not clear and require further elucidation. Specifically, the attorneys fees exhibits were voluminous, convoluted, overlapping, and in many cases submitted in connection with arguments concerning contingency fees. Therefore, within fourteen days of this Opinion, if the parties cannot come to an agreement as to the correct final amount of Byrd & Byrd's hourly bills, each party shall submit a brief itemizing Byrd & Byrd's reasonable hourly fees and proposing an appropriate final award in this case. The Court agrees with Haselrig that the following items constitute appropriate adjustments and should either be credited or excluded in their submission of the hourly fee calculation:

(1) any prior payments made by Mr. Stancil;

(2) the First Interpleader Action Funds ($74,323.94) previously awarded to Byrd & Byrd by this Court;

(3) any work performed in conjunction with the First Interpleader Action that was performed contrary to the instructions of Haselrig and in support of the claims of Byrd & Byrd;

(4) any work performed in conjunction with the separate BJY matter; (5) any secretarial work mistakenly billed as law clerk fees; and

(6) any overpaid finance charges.

Indeed, the Court will adjust and disregard where appropriate these items from the final total award should the parties

---

3. Indeed, Haselrig argues that the severity of Byrd & Byrd's wrongdoing, particularly with regard to the conflict of interest issue, counsels against the imposition of any legal fee whatsoever. *See Somuah v. Flachs*, 352 Md. 241, 721 A.2d 680, 685 (1998) (fee forfeiture may be an appropriate remedy where attorney represents conflicting interests).

improperly include or fail to credit these items in their hourly fee calculations.

## IV. CONCLUSION

For all of the aforementioned reasons, the Court finds that the USPS Contingency Fee Agreement between Haselrig and Byrd & Byrd is invalid and that Byrd & Byrd's reasonable hourly fees will constitute a fair award in this case. An Order consistent with this Opinion will follow.